# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEPHEN VAN SADERS,<br>JAMIE VAN SADERS, and<br>BBJSC, Inc, | Case No.  19-cv-1414 (MJD/ECW) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| FRANCHOICE, INC. and<br>SCOTT JONES, | |
| Defendants. | |

This matter is before the Court on Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6).  (Dkt. 11.)  This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The operative Complaint alleges as follows: Stephen Van Saders is an individual citizen of New Jersey, and resides in Manalapan, New Jersey.  (Dkt. 1 ¶ 4.)  Stephen Van Saders, along with his wife Jamie Van Saders, formed BBJSC, Inc., a New Jersey Corporation, as a vehicle for acquiring a franchise from Non-Party ILKB, LLC, the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness.  (*Id.* ¶¶ 3-5.)

Stephen Van Saders became interested in purchasing a franchise in 2014; they engaged Franchoice, Inc. ("FCI") and, in turn, the FCI consultant and representative Scott Jones ("Jones"), to assist him in finding appropriate opportunities.  (*Id.* ¶ 12.)  FCI is a corporation formed under the laws of Minnesota, with its principal place of business in Eden Prairie, Minnesota.  (*Id.* ¶ 6.)  It is a franchise broker that assists prospective franchisees in identifying, investigating, selecting, and acquiring franchises.  (*Id.*)  Jones, an FCI representative, is an individual residing in Arvada, Colorado, and is a citizen of that state.  (*Id.* ¶ 7.)

Through its website (https://www.franchoice.com/), FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business."  (*Id.* ¶ 13.)  FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected …as franchise businesses matching [his] requirements."  (*Id.*)  FCI further represented that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you."  (*Id.*)

In a May 14, 2014 email to Van Saders, Jones stated that he would "find safe, proven franchises for you to investigate" and "use my 20 plus years of experience to guide you through the franchise investigation process."  (*Id.* ¶ 14.)  He also represented that he was "uniquely qualified to help you find your ideal franchise as I have been involved with franchising at every level"; that at "FranChoice we have pre-screened thousands of franchise companies to determine a select group that represent successful

and dynamic opportunities for the individuals we represent"; and he would "work with you through the entire investigation process from start to finish, ensuring you have proper information to make an informed and educated decision." (*Id.*)

Jones directed Van Saders to the FCI website to fill out a questionnaire about his needs and desires for a franchise. (*Id.* ¶ 15.) In May 2014, Jones introduced Van Saders to various franchise opportunities, including ILKB, and stated that these franchise opportunities, "are not only great matches to your model, they back up their system with superior training, marketing and operational support." (*Id.* ¶¶ 16-17.)

Prior to the purchase of a ILKB franchise, FCI and Jones made the following representations or omissions concerning the financial performance of the franchise: ILKB franchises have average annual revenues of $650,000, and average annual profits of $132,000; the average monthly expenses of running a studio were between $25,000 and $35,000; it would be possible to resell undeveloped franchise territories because the demand for territories exceeded the current supply; the cost to build out and open a studio was $150,000 and that it was only necessary to have $30,000 in working capital to cover expenses at the outset, because the franchise would break even in three months; ILKB franchises were not only suitable for absentee ownership, but that ILKB recommended owners not be present at the studio to let the manager run the business; ILKB franchise owners would work only 20 hours per month; no ILKB studio had ever closed; and that kickboxing was not a "fad." (*Id.* ¶¶ 18-21.)

After Jones put Van Saders in touch with ILKB, ILKB repeated the representations that Jones had made; as Van Saders continued to meet and communicate

3

with ILKB to discuss purchasing the franchise, he reported his discussions with ILKB to Jones, who "coached" him throughout those discussions toward a decision to purchase not only a single ILKB franchise, but the rights to open multiple units. (*Id.* ¶ 22.)

In reliance upon the representations by FCI and Jones, Plaintiffs invested $90,000 in franchise fees for three locations. (*Id.* ¶ 23.) Plaintiffs also spent over $360,000 in outfitting and opening the Hamilton, New Jersey location; and undertook substantial lease and loan obligations in excess of $550,000. (*Id.*) Plaintiffs' location in Hamilton, New Jersey opened in April 2016. (*Id.*) FCI and Jones received a commission from ILKB for the sale to Van Saders in an amount in excess of $50,000 of the $90,000 that Van Saders paid to ILKB for his franchise rights. (*Id.* ¶ 24.)

After opening the business, Plaintiffs learned that the representations that FCI and Jones had made relating to ILKB franchises were untrue, including: the representations regarding the claimed starting and operating costs; that the franchise was suitable for absentee ownership (instead requiring full-time attention by the owner); representations relating to the marketing of the franchise; representations that there had been no closures of ILKB franchises; and the expected income of ILBK franchises. (*Id.* ¶ 27.) In addition, FCI never disclosed that attrition made it impossible to attain or maintain the levels of membership needed to "break even." (*Id.* ¶ 27(e).) Defendants also failed to do or disclose their due diligence by not discovering or communicating to Plaintiffs the existence of lawsuits and a bankruptcy related to ILKB's founder and its affiliates. (*Id.* ¶ 29.) Plaintiffs assert that had they known of this information they would not have purchased any franchises from ILBK. (*Id.*)

Plaintiffs assert claims for relief against Defendants for their alleged violations of the New Jersey Consumer Fraud Act § 56:8-1 and the Minnesota Franchise Act, Minn. Stat. §80C.01 *et seq.* Plaintiffs also assert claims against Defendants for common law fraud and negligent misrepresentation.

Defendants move to dismiss Plaintiffs' New Jersey Consumer Fraud Act ("NJSA") and Minnesota Franchise Act ("MFA") claims.

## II.   LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In addition, a court must afford the plaintiff all reasonable inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the United States Supreme Court in *Iqbal* and *Twombly*.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

> Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:

> While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n. 3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P.

12(d). While matters "outside the pleadings" may not be considered in deciding a Rule

12 motion to dismiss, documents "necessarily embraced by the complaint are not matters

outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

Thus, while courts primarily consider the allegations in the complaint in determining

whether to grant a Rule 12(b)(6) motion, courts additionally consider matters

incorporated by reference or integral to the claim, items subject to judicial notice, matters

of public record, orders, items appearing in the record of the case, and exhibits attached

to the complaint whose authenticity is unquestioned, without converting the motion into

one for summary judgment. *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688

F.3d 928, 931 n.3 (8th Cir. 2012).

## III.    ANALYSIS

### A.    Plaintiffs' Claim Under the New Jersey Consumer Fraud Act

Defendants argue that while the NJCFA applies to the sale or advertisement of

merchandise and real estate, it does not apply to the sale of franchises. (Dkt. 13 at 6.)

Under the NJCFA:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, **in connection with the sale or advertisement of any merchandise or real estate**, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.

N.J. Stat. § 56:8-2 (emphasis added).  Although the Act is entitled "[a]n Act concerning

consumer fraud, its prevention, and providing penalties therefor," L. 1960, c. 39, it

contains no definition of consumer.  Under the Act, "[t]he term 'merchandise' shall

include any objects, wares, **goods, commodities, services <u>or anything</u> offered, directly

or indirectly to the public for sale** . . . ."  N.J. Stat. § 56:8-1(c) (emphases added).

Defendants rely upon a Third Circuit decision holding that the NJCFA can never apply to

the sale or acquisition of a franchise (Dkt. 13 at 7-8):

> We conclude that even where franchises or distributorships are available to
> the public at large in the same sense as are trucks, boats or computer
> peripherals, they are not covered by the Consumer Fraud Act because they
> are businesses, not consumer goods or services.  They never are purchased
> for consumption.  Instead, they are purchased for the present value of the
> cash flows they are expected to produce in the future and, like the technology
> and services acquired in BOC Group, bear no resemblance to the
> commodities and services listed in the statutory definition of "merchandise"
> or the rules promulgated by the Division of Consumer Affairs.

*J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1274 (3d

Cir. 1994); *see also Lawmen Supply Co. of New Jersey, Inc. v. Glock, Inc.*, 330 F. Supp.

3d 1020, 1045 (D.N.J. 2018) (citations omitted) ("[T]he majority of Courts in this district

have followed the Third Circuit's interpretation of the NJCFA.").

Plaintiffs counter that since the Third Circuit's decision, the New Jersey Supreme

Court in its *All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.*, 236 N.J. 431 (2019),

decision implicitly rejected *J & R Ice Cream*'s reasoning and set forth clear factors for

determining whether "merchandise" is at issue; and that under those factors, the sale of a

franchise constitutes the sale of "merchandise" and the sale of the ILKB franchise falls

squarely within the Act.  (Dkt. 19 at 3-6.)

The matter in *All the Way Towing* involved a dispute between businesses related to the purchase of a customized tow truck. *See All the Way Towing*, 236 N.J. at 435-37. The court first reiterated that "it is well established that the CFA is applicable to commercial transactions." *Id.* at 443 (quotation marks and citations omitted). Noting that the history of the NJCFA has been "one of constant expansion of consumer protection," the Court also found that the customization of an item does not in itself remove it from the definition of merchandise under the NJCFA as an item available "to the public," and concluded that "a more nuanced assessment can be required to determine whether a transaction, good, or service is of the type offered to the public, bringing it within the CFA." *Id.* at 442, 445 (cleaned up).

The nuanced analysis expounded by the New Jersey Supreme Court with respect to business-to-business transactions, such as the one at issue in this case, involves looking at the "nature of the transaction" to determine whether it fits within the CFA's definition of "merchandise," and takes into account the following factual considerations:

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and, as previously noted; (4) the public availability of the subject merchandise.

*Id.* at 447-48.

The New Jersey Supreme Court then undertook a factual analysis and concluded that the customized tow truck fell within the definition of merchandise, noting that no attorney or expert was needed to execute the transaction, that simply because identically

customized tow trucks are not typically sold to the "public at large" does not mean the trucks are not offered "to the public for sale," and that "the relevant point is that a member of the public so inclined could purchase an operational tow truck consisting of a Dynamic 801 tow body installed onto an International chassis." *Id.* at 448.

Defendants argue that the franchise agreement at issue (Dkt. 16-1) supports a finding that a franchise is not available to the public as it is within non-party ILKB's discretion whether to grant a franchise based on an examination of a prospective franchisee's business experience, reputation, character, and ability to conduct the business. (Dkt. 13 at 14-15.) Defendants, however, ignore the holding in *All the Way Towing* that the public "availability requirement can be met by showing that any member of the public could purchase the product or service, **if willing <u>and able</u>**, regardless of whether such a purchase is popular." *All the Way Towing*, 236 N.J. at 447 (emphases added). In other words, the fact that some members of the public in general may not be able to meet ILKB's purported standards does not take a franchise outside of the definition of merchandise for the purposes of the NJCFA. Moreover, regardless of the franchise agreement, whether ILKB franchises are available to the public under the *All the Way Towing* factors is a factual dispute not appropriately resolved on a motion to dismiss, as discovery will be necessary to determine what ILKB's real standards in practice, if any, except for the ability to pay, mattered.

Similarly, Defendants rely upon the length of the franchise agreement with ILKB, and the fact that the agreement provides what appears to be a boilerplate contract provision acknowledging that Plaintiffs had the opportunity to consult with counsel for

the proposition that the transaction was complex and that the parties were sophisticated. (Dkt. 13 at 15-16.)  Again, while this is relevant evidence, the Court cannot find as a matter of law at this stage in the proceedings that the franchise at issue does not qualify as merchandise based on the franchise agreement.[1]  Discovery will be necessary to provide the Court with a complete understanding of the actual complexity of the transaction and sophistication of the parties, including whether they independently sought the assistance of attorneys and other financial professionals prior to entering into the franchise agreement, along with evidence relating to the other factors relevant to the *All the Way Towing* analysis to make an appropriate and "more nuanced assessment" at summary judgment.  *See All the Way Towing*, 236 N.J. at 445.

Defendants also contend that the *All the Way Towing* decision did not alter the key determination in the Third Circuit case that the NJCFA does not apply to franchises because franchises are not merchandise, especially since the Third Circuit concluded that

---

[1]    Defendants argue that the transaction in the present case is similar to the transaction in *Finderne Management Co., Inc. v. Barrett,* 955 A.2d 940, 402 N.J. Super. 546 (App. Div. 2008), which involved a 64-page disclosure that led, in part, to the conclusion that the NJCFA did not apply to the transaction.  (Dkt. 13 at 15-16.)  However, the decision in *Finderne Management*, dealing with a decision on summary judgment, did not involve a franchise, but rather "a tax-deductible vehicle to fund pre-retirement death benefits for owner-employees."  402 N.J. Super. at 553.  The court ultimately held that the CFA was inapplicable, but cited a number of fact-specific reasons after discovery including that: the contract included a "sixty-page disclosure document" and recommendations to consult tax attorneys; rather than one transaction, it was a series of "very complex" transactions, which took place over the course of years; and the Plaintiffs were not "unsophisticated buyers," but rather were ultimately informed through advice from an accountant and an attorney.  *Id.* at 554-57, 570-73.  Again, the Court does not find that the franchise in this case is definitively merchandise for the purposes of the NJCFA, but rather because the *All the Way Towing* analysis is such a fact driven analysis, it is a decision, based on the alleged transaction, appropriately suited for resolution at summary judgment or trial, not on a motion to dismiss.

a franchise is a business and not goods or services for consumers. (Dkt. 13 at 9-12.) Indeed, as set forth above, the Third Circuit in *J & R Ice Cream* found that while "franchises or distributorships are available to the public at large in the same sense as are trucks, boats or computer peripherals, they are not covered by the Consumer Fraud Act because they are businesses, not consumer goods or services. They never are purchased for consumption." 31 F.3d at 1274. The Third Circuit's interpretation of New Jersey state law is not binding on this Court, and the Court finds the Third Circuit's 1994 interpretation of "merchandise" in the *J & R Ice Cream* overly narrow given that the definition in the Act includes "any objects, wares, goods, commodities, services **or anything** offered, directly or indirectly to the public for sale . . . ." N.J. Stat. § 56:8-1(c) (emphasis added).

Moreover, at least one New Jersey Court of Appeals (as opposed to the federal district courts out of the District of New Jersey bound by the Third Circuit's decision)[2] has rejected the narrow scope of the decision in *J & R Ice Cream* with respect to franchises. In *Kavky v. Herbalife Int'l of America*, 359 N.J. Super. 497, 820 A.2d 677 (App. Div. 2003), the court rejected the Third Circuit's focus on whether the plaintiff was a consumer in terms of a business transaction, noting that there was no definition within the NJCFA as to who would be included as a consumer under the Act, and found that the

---

[2]     The Court notes that New Jersey state courts are not bound by the decisions of the Third Circuit. *See Donovan v. Port Auth. Trans-Hudson Corp.*, 309 N.J. Super. 340, 351, 707 A.2d 171, 177 (App. Div. 1998).

Third Circuit had ignored the definition of merchandise under the Act. 359 N.J. Super. at

500-02. Indeed, the court found that at issue was:

> [W]hether the purchaser of a franchise distributorship is protected by the Act,
> or to put it somewhat differently, do franchises and distributorships
> come within the Act's definition of merchandise. Our answer is that they are
> included when they are not covered by the Franchise Practices Act and are
> offered to the general public.

*Id.* at 501. The court found that a franchise not regulated by the Franchise Practices Act

"involves the provision of both services and commodities. Thus, it is covered as

something offered to the public for sale" under the definition of merchandise. *Id.* at 508.[3]

The Court finds that decision in *Kavky* more persuasive than the Third Circuit's

holding under *J & R Ice Cream*, given the broad definition of "merchandise" under

NJCFA, which can include "anything," subject to the analysis set forth by New Jersey

Supreme Court in *All the Way Towing*, which will require this Court to undertake a

nuanced fact-intensive inquiry to determine if the franchise at issue was actually available

to the public for sale. In other words, the Court concludes that a franchise, as alleged in

the Complaint, can constitute merchandise under New Jersey law. That assertion will be

tested via discovery in accordance with the factors set forth in *All the Way Towing*, *supra*,

to determine if the ILKB franchise was offered, directly or indirectly, to the public for

sale.

Similarly, the Court finds that the services provides by Defendants in finding

Plaintiffs with franchise opportunities, as alleged and argued by Plaintiffs (Dkt. 1 ¶ 40;

---

[3]     No party has asserted that the franchise at issue is governed by the New Jersey
Franchise Practices Act.

Dkt. 9 at 13-14), may also qualify as "merchandise" under the NJCFA, as the Act governs a broad array of activities, including "services" and covers "anything offered, directly or indirectly, to the public for sale."  N.J. Stat. § 56:8-1(c).  Any assertion that Defendants' services are not offered to the public is belied by the allegation in the Complaint that FCI holds itself out to the public on its website as helping those who are seeking to find the perfect franchise and offering to coach them through the process (Dkt. 1 ¶ 13), and are indeed alleged throughout the Complaint to have provided these services to Plaintiffs.  The fact that Plaintiffs did not pay Defendants directly for their services is of no import given they were paid commissions for ultimately matching Plaintiffs with ILKB.  *See generally*, *Vagias v. Woodmont Properties, L.L.C.*, 384 N.J. Super. 129, 134-36, 894 A.2d 68, 71 (App. Div. 2006) (reversing summary judgement on a NJCFA claim involving a real estate agent who was paid a commission by home builder on the basis that the plaintiff had adequately demonstrated an injury).

For all of the reasons state above, Defendants' motion to dismiss Plaintiffs' NJCFA claim should be denied.

## B.    Plaintiffs' Claim under the Minnesota Franchise Act

According to Defendants, to be covered by the MFA, the sale or offer to sell had to be made in Minnesota.  (Dkt. 13 at 17.)  Defendants, relying upon Minn. Stat. § 80C.19, argue that the MFA cannot apply to Plaintiffs' claims because Plaintiffs have only identified a franchise unit located in New Jersey, not in Minnesota, and Jones is alleged to reside in Colorado and only communicated to Plaintiffs (non-Minnesota residents) via the telephone and email.  (*Id.* at 17-18 (citing Dkt. 1 ¶¶ 7, 17-18, 23).)

14

Plaintiffs counter with agency and respondeat superior theories, asserting that because Jones, a Colorado resident,[4] is the agent of a Minnesota corporation,[5] the offer originated from Minnesota for the purposes of the MFA.  (Dkt. 19 at 18-21.)

> Under Minnesota law:
>
> No person may offer[6] or sell a franchise **in this state** by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Minn. Stat. § 80C.13, subd. 2 (emphasis added).

> With respect to liability under § 80C.13, the MFA defines an offer to sell or a purchase of a franchise "in this state" as follows:
>
> Subd. 1.  Applicable sales and offers to sell or purchase.  The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state.
>
> Subd. 2.  Offer to sell or purchase made in state.  For the purpose of sections 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, when the offer originates from

---

[4]    Plaintiffs do not plausibly allege or argue that Jones himself, outside of agency theory, took any actions aimed towards or from Minnesota relating to the present claims.

[5]    Plaintiffs also point to the allegations in the Complaint (Dkt. 1 ¶¶ 36, 39) where they assert that FCI and Jones solicited Plaintiffs within Minnesota (Dkt. 19 at 23). However, these conclusory assertions are insufficient, as merely being a formulaic recitation of a requirement for a viable MFA cause of action.  *See Iqbal*, 556 U.S. at 678. It is clear by the specific facts alleged in the Complaint that it was Jones as an agent of FCI who made the representations at issue to induce an offer from Plaintiffs to ILKB.

[6]    Similar to the NYSFA, as set forth in the Court's Reports and Recommendations in related matters, under the MFA, "offer" and "offer to sell" "includes every attempt to offer to dispose of, and **every solicitation of an offer to buy**, a franchise or interest in a franchise for value."  Minn. Stat. § 80C.01, subd. 16 (emphasis added).

this state or is directed by the offeror to this state and received by the offeree in this state.

Subd. 3.  Offer to purchase or sell accepted in state.  For the purpose of this section, an offer to purchase or to sell is accepted in this state when acceptance is communicated to the offeror in this state, and has not previously been communicated to the offeror, orally or in writing, outside this state; and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received by the offeror in this state.

Subd. 4.  Offer to sell or purchase not made in state.  An offer to sell or to purchase is not made in this state when the publisher circulates or there is circulated in the publisher's behalf in this state any bona fide newspaper or other publication of general, regular and paid circulation which is not published in this state, or when a radio or television program originating outside this state is received in this state.

Minn. Stat. § 80C.19.

The MFA "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry."  *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citation omitted); *see also Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978).  When the MFA was introduced as a bill in 1973, it was described as a "bill to give the commissioner of securities some control over the franchising business in the state of Minnesota."  *In re Ne. Exp. Reg'l Airlines, Inc.*, 228 B.R. 53, 59 (Bankr. D. Me. 1998) (quoting Hearing on the Minnesota Franchise Act Before the Minnesota Senate, 68th Legis., Reg. Sess. (Minn. 1973) (statement by unidentified senator)).  *Clapp*, relied upon by Defendants, dealt with a technical violation of the MFA requiring a person offering or selling a franchise within the state to register with the Commissioner of Securities a proposed public offering

16

statement making full disclosure of all facts required by statute or rules of the

commissioner.  327 N.W.2d at 586 (citing Minn. Stat. §§ 80C.02 (1980), 80C.04 (1980)

and 80C.06 (1980)).  It rendered no analysis in its decision as to whether the defendant

was offering or selling a franchise within the state.  *Martin Investors*, *supra*, only

involved a Minnesota-based franchisee where the defendant published advertisements for

consultants in at least two newspapers published within Minnesota; the agent of the

defendant discussed the proposed consultant arrangement in a long-distance telephone

call with an agent of the plaintiff, who was within Minnesota, and the defendant CCC

then mailed a sample copy of its standard consultant agreement to him in Minnesota.  *See*

*Martin Investors*, 269 N.W.2d at 873.  Based on these facts, the court concluded:

> Through these activities, CCC directly induced a Minnesota resident to enter
> a contractual relationship upon essentially all of the terms proposed in the
> sample consultant agreement forwarded to Faye but without the benefit of
> the full disclosure provided by the registration requirements of the Franchises
> Act.  This is precisely the kind of activity that our act was designed to
> regulate and that must be subjected to the requirements of registration and
> full disclosure if the protective purposes of the act are to be realized.

*Id.*  The Minnesota Supreme Court went on to reject the notion that an offer made in

Minnesota needed to be shown in the "strictest sense of contract law" as requiring too

narrow a reading of the MFA as a remedial statute.  *Id.* at 873-74.  Recently the

Minnesota Court of Appeals noted that while the *Martin Investors* court "recognized the

legislature's intent in adopting the MFA was to protect franchisees in Minnesota" it did

"not address . . . the scope of the MFA."[7]  *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019).

One court in this district has characterized territorial applicability of the MFA as "murky."  *Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1062 (D. Minn. 2014).  Indeed, courts examining the issue have reached inconsistent results.  For example, in *Healy v. Carlson Travel Network Associates, Inc.*, 227 F. Supp. 2d 1080 (D. Minn. 2002), the court rejected an argument similar to the one being presented by Plaintiffs:

> Healy urges that the statute applies because the offer to sell the franchise came from an agent of Carlson, a Minnesota corporation.  No authority is cited for the proposition that the MFA applies merely because the franchisor is a Minnesota corporation.  Healy concedes that Crider, the Carlson agent he contacted for information and with whom he negotiated the sale, was based in Florida.  The newspaper advertisement for Carlson franchise opportunities that Healy responded to, was placed in the Chicago Tribune by Crider's office in St. Petersburg, Florida.  The Agreement was presented to and signed by Healy in Illinois.  Healy has not demonstrated that the MFA applies to his case.

*Id.* at 1088; *see also Klosek v. Am. Express Co.*, No. CIV. 08-426 JNE/JJG, 2008 WL 4057534, at *21 (D. Minn. Aug. 26, 2008), *aff'd*, 370 F. App'x 761 (8th Cir. 2010) ("As the statute indicates, the geographic limits do not apply to the entire MFA, but only to

---

[7]    In *Cambria*, the Court considered, but ultimately declined, a request to certify the following question: "May a non-Minnesota resident claiming to be a franchisee invoke the provisions of the Minnesota Franchise Act where its only connection with Minnesota is the location of the purported franchisor?"  2019 WL 3543602, at *2.

'the provisions concerning sales and offers to sell.'") (quoting Minn. Stat. § 80C.19, subd. 1) (cleaned up).[8]

At least one court has held that "even where a party to a 'franchise agreement' is a Minnesota corporation, the agreement is not within the purview of the MFA if the franchisee is not located in and does not operate in Minnesota." *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011) (citing *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011)). The basis of the court's holding was that the "MFA applies only to 'franchise agreements' within the purview of Minnesota law. Minnesota cannot regulate 'franchise agreements' that are formed and preformed in other states." *Id.* (citing *In re St. Paul & K.C. Grain Co.*, 89 Minn. 98, 94 N.W. 218, 225 (Minn. 1903) (noting that "general rule" is that state statutes apply only to territory of state that enacted the statute)).

In *Candleman Corp. v. Farrow*, No. 9802463, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614 (D. Minn. Feb. 1, 1999), the court found that the MFA applied to the facts in that case because (1) the franchisor's offer to sell the franchise originated from the franchisor's Minnesota office; (2) the acceptance of the offer was

---

[8]    The Court in *Klosek*, distinguished the facts in that case from those in *Healey* as follows:

> And though Ameriprise urges otherwise, it appears that *Healy* chiefly involved misrepresentations in the sale of a franchise, and not other complaints under the MFA. *See id.* at 1083-84. Because the current litigation does not involve a sale or offer to sell, it is distinguishable from *Healy*.

2008 WL 4057534, at *21.

received by the franchisor in Minnesota; and (3) the franchise agreement's choice of law provision provided for Minnesota law.  *Id.*

In *Wave Form*, *supra*, the plaintiff, an Oregon company, asserted that the MFA applied to its agreement with a Minnesota manufacturer, because the manufacturer's offer to sell originated from Minnesota and acceptance of that offer was received by AMS in Minnesota.  73 F. Supp. 3d at 1059.  The plaintiff argued that the "originated from" language was met when the manufacturer transmitted the agreement from its office in Minnesota to Wave Form in Oregon, and the "received by the offeree in this state" language was satisfied when Wave Form executed and subsequently returned the agreement to AMS in Minnesota for its signature.  *Id.* at 1060.  In an order on a motion for a preliminary injunction, the court found that "Wave Form's position, while it is seemingly a fair construction of the statutory language, fails to account for the MFA's territorial application that was intended by the legislature," and reaffirmed that the "legislative intent behind the passage of the [Franchise Act] was to protect Minnesota franchisees located within Minnesota."  *Id.* (citing *Martin Investors*, 269 N.W.2d at 872).  Ultimately, the Court held as follows with respect to whether the plaintiff was likely to prevail on its MFA claim:

> At present, whether Wave Form will likely succeed on the merits of its claim is uncertain.  The entirety of Wave Form's position rests on the applicability of the MFA.  While a construction of the language of the statute does support Wave Form's position, the Minnesota nexus with the factual predicate is very minimal.  Other than receiving an offer transmitted from Minnesota and then remitting acceptance back to Minnesota, Wave Form has had no contact with Minnesota.  Wave Form has never had a single sale in this state nor does it have any physical presence here.  While Wave Form does conduct business in states outside of Oregon, it is undisputed that Minnesota is not one of them.

> To construe the MFA broadly enough to apply here given the facts currently
> of record in this case is a stretch.

*Wave Form*, 73 F. Supp. 3d at 1061.

This Court's decision must be informed foremost by the plain language of the

MFA.  *See Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001).  Here,

the pertinent portion of § 80C.19, dealing with offers made in this state provides:

> Offer to sell or purchase made in state.  For the purpose of sections 80C.01
> to 80C.22, an offer to sell or to purchase is made in this state, whether or not
> either party is then present in this state, **when the offer originates from this
> state** or is directed by the offeror to this state and received by the offeree in
> this state.

Minn. Stat. § 80C.19, subd. 2 (emphasis added).  There is nothing in the language of the

statute suggesting that the MFA cannot apply to a foreign franchisee when the offer, in

this case a solicitation, "originates" from Minnesota.  The Court in *Wave Form* conceded

that this was "seemingly a fair construction of the statutory language," 73 F. Supp. 3d at

1060, before ignoring that same language and concluding that the legislative intent

behind the passage of the MFA was to protect Minnesota franchisees located within

Minnesota.  There is nothing in the MFA remotely carving out such an exception.

Indeed, in 1981, the legislature added an exemption to the MFA's registration

requirements under Minn. Stat. § 80C.02, exempting any "offer or sale of a franchise to a

resident of a foreign state, territory, or country who is neither domiciled in this state nor

actually present in this state, if the franchise business is not to be operated wholly or

partly in this state, and if the sale of this franchise is not in violation of any law of the

foreign state, territory, or county concerned."  Minn. Stat. § 80C.03(h) (1981 Supp.).

Had the legislature desired a similar carve-out regarding the prohibitions set forth in

Minn. Stat. § 80C.13 for franchises located outside of the state of Minnesota it could have included a similar exemption within Section 80C.03. If the statutory language were construed as urged by Defendants, Minnesota would be without authority to enforce its franchise laws against a business located physically within Minnesota, but which directed its fraudulent efforts towards non-residents **from** within Minnesota. It is unlikely that the legislature intended such a result. Instead, the focus, based on the plain language of the statute is on the nexus of the conduct—whether the solicitations at issue originated from Minnesota. *See Candleman*, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614. Such an interpretation is most consistent with the language of the MFA and the general rule that Minnesota statutes are to apply to conduct within its borders.

However, the Court cannot interpret the MFA so broadly that it will apply to a Minnesota company, such as FCI, even through a theory of respondeat superior or agency as argued by Plaintiffs (Dkt. 19 at 18-21), if none of the illegal acts complained of originated from Minnesota. *See Healy*, 227 F. Supp. 2d at 1088. The Court will not rewrite the MFA to encompass such acts, regardless of its remedial nature.

The only allegations in the Complaint regarding Jones are that he is an agent of FCI and that he resided and is a citizen of Colorado. (Dkt. 1 ¶ 7.) There are no factual allegations in the Complaint suggesting that the operative solicitations at issue originated from Minnesota, including that Jones made the representations while in Minnesota. Under the doctrine of respondeat superior, "'the act of an agent within the scope of his agency is the act of his principal. The principal is liable because the law attributes to him the act of his agent, with the result that both are liable jointly and severally to the person

22

injured by the wrongful act.'" *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1380 (D. Minn. 1997) (quoting *Melady v. South St. Paul Live Stock Exch.*, 142 Minn. 194, 171 N.W. 806, 807 (1919)) (cleaned up).  Even assuming that these doctrines apply to the MFA, they only impute the acts of Jones back to FCI in Minnesota for purposes of liability and do not speak to what matters for the purposes of the MFA— whether the malfeasance at issue originated from Minnesota.  It would be a closer question if the Complaint alleged that someone from within FCI in Minnesota directed Jones to make the specific alleged solicitations to Plaintiffs.  However, that is not the case here.[9]

For all of these reasons, the Court finds that Plaintiffs' MFA claim should be dismissed.

## IV.    <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **GRANTED** in part and **DENIED** in part as follows:

---

[9]    Plaintiffs asked that, if the Court finds the Complaint does not state a claim under the MFA, the Court give Plaintiffs leave to amend on the basis of an Independent Consultant Agreement between FCI and its consultants regarding certain generalized procedures and requirements.  (Dkt. 19 at 1-2, 18.)  However, even if there is such an agreement, it does not mean that the representations originated in Minnesota, as it does not change the fact that it is not alleged that Jones himself made the operative allegedly fraudulent solicitations at issue from within Minnesota or that they otherwise originated in Minnesota.

1.      Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **GRANTED** as to Plaintiffs' claim under the Minnesota Franchise Act, and that the claim be **DISMISSED WITHOUT PREJUDICE**; and

2.      Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **DENIED** as to Plaintiffs' claim under the New Jersey Consumer Fraud Act.


DATED: December 19, 2019                    _s/ Elizabeth Cowan Wright_
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge




## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).